IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR-F-92-5164 REC |
| | ) | |
| | ) | ORDER DENYING PETITIONER'S |
| | ) | MOTION FOR COURT ORDERED |
| Plaintiff/ | ) | TESTING OF GOVERNMENT |
| Respondent, | ) | EXHIBITS (Doc. 859); |
| | ) | PETITIONER'S MOTION FOR |
| vs. | ) | COURT ORDERED RELEASE OF |
| | ) | GOVERNMENT EXHIBITS (Doc. |
| | ) | 860); AND PETITIONER'S |
| THOMAS R. FARRUGIA, | ) | MOTION FOR COURT ORDER TO |
| | ) | STATE ATTORNEY GENERAL |
| | ) | LOCKYER TO RELEASE COPIES |
| Defendant/ | ) | (Doc. 862) |
| Petitioner. | ) | |
| | ) | |

On January 9, 2006, petitioner Thomas R. Farrugia, proceeding <u>in pro per</u>, filed a "Motion Seeking a Court 'Order' for the Thorough Testing of the Government's Trial Exhibits 3-A & 5-A, (Which the Government Finally Located in the Possession of the California Department of Justice - Bureau of Narcotics), Petitioner Can and Will Support His Actual Innocence Claims with the Chemical Tests Results of 3-A & 5-A". On March 13, 2006,

1

petitioner filed a "Motion for Court Order Release of Samples of Trial Exhibits 3-A and 5-A from the California Bureau of Narcotic Enforcement, (BNE), to Attorney Cheryl Strum for the Purpose of Having Them Analyzed to Determine Their Exact Chemical Make-Up to Establish Movants Actual Innocence."  By these motions, petitioner seeks "a Court ORDER for the thorough testing of the Government's Trial Exhibits 3-A and 5-A [¶ which] testing is to determine the exact chemical make-up, the purity, identifying the adultants [sic] and the individual weights of 3-A and 5-A" to show "their exact chemical make-up to prove his Actual Innocence Claims."  Government Trial Exhibit 3-A is a 55 pound tin of ephedrine seized during a search at 3904 Fir Street, Fresno, CA on May 20, 1992.  Government Trial Exhibit 5-A is a box of suspected ephedrine seized during a search of 48038 93rd Street, Lancaster, CA on May 20, 1992.

On May 1, 2006, petitioner filed a "Motion for Court Order to the California State Attorney General, Bill Lockyer, to Produce Copies of the Material Safety Data Sheet, Packaging & Product Information Telling the Chemical Make-Up & Content of the 55 Lb Tins of Ephedrine Provided By & Stored in the Evidence Vault of the State Bureau or Narcotic Enforcement & Used in this Case as 'Trial Exhibit 3-A'".  In the May 1 motion, petitioner asserts:

> The requested information, such as the 'Material Safety Data Sheet' on stored hazardous chemicals that may be toxic, dangerous or pose a public safety hazard are required by state and federal law (See § 302

2

> of the Emergency Planning & Community Right to Know Act of 1986 [42 USCS § 11002]). State Attorney General Bill Lockyer has refused Petitioner's F.O.I.A Requests for the documented information such as the Material Safety Data Sheet in violation of state, federal, E.P.A. & OSHA laws.

Petitioner further contends that the Material Safety Data Sheet "shows the exact chemical make-up of <u>Trial Exhibit 3-A</u>" and that the Material Safety Data Sheet "in lieu of actually being able to have <u>Trial Exhibit 3-A</u> analyzed, would provide Petitioner with the long sought after exculpatory evidence to prove his Actual Innocence Claim that was presented in his 2255 Motion." Petitioner asserts that "[o]nce the true chemical make-up of <u>Trial Exhibit 3-A</u> can be established Petitioner will have the Newly Discovered (& with held) Evidence needed to re-open the 2255 Motion Proceedings and to establish his valid Actual Innocence Claim."

### A.  **Background**.

Petitioner and four co-defendants where charged with conspiracy and drug trafficking.  Petitioner was charged with one count of conspiracy to manufacture methamphetamine and one count of possession of a listed chemical with the intent to manufacture a controlled substance.  All co-defendants but petitioner and co-defendant Donald Kapperman pleaded guilty.  Prior to trial, petitioner, acting <u>in pro per</u>, filed a number of motions for re-testing of the Government's chemical exhibits to determine their exact chemical make-up (Docs. 141, 268, 386, 432).  These motions were denied because petitioner was represented by counsel.

1  (Docs. 151, 394, 439).  Petitioner and Kapperman proceeded to
2  trial.  A mistrial was declared with regard to Kapperman but the
3  trial continued as to petitioner and the jury returned a guilty
4  verdict on both counts.  Following his conviction, petitioner,
5  again acting <u>in pro per</u>, filed a number of motions seeking to
6  compel the re-testing of the Government's chemical exhibits to
7  determine their exact chemical make-up (Docs. 470, 477, 515).
8  These motions again were denied (Docs. 543, 553).  Petitioner
9  then appealed his conviction and sentence to the Ninth Circuit.
10 Petitioner's conviction was affirmed by the Ninth Circuit.
11 <u>United States v. Farrugia</u>, 1996 WL 403026 (9th Cir. 1996).
12 Petitioner did not contend on direct appeal that the denials of
13 his various motions to compel the re-testing of the Government's
14 chemical exhibits was error.
15    On March 16, 1998, petitioner filed a motion to vacate, set
16 aside or correct sentence pursuant to 28 U.S.C. § 2255 (Doc.
17 757).  On April 6, 1998, petitioner again filed a motion for the
18 thorough testing of seized chemical samples and Government
19 exhibits to determine their exact chemical make-up and for a stay
20 or continuance of the Section 2255 motion pending the results of
21 those tests (Doc. 768).  This motion for retesting was denied,
22 the court ruling that it would not order retesting of trial
23 exhibits 3-A and 5-A.  (Doc. 771).  In the Order denying
24 petitioner's Section 2255 motion filed on October 10, 2000, the
25 factual background to petitioner's conviction is set forth and
26 adopted herein.

Detective Toby Rien of the Fresno County Sheriff's Office posed as an illicit seller of ephedrine which is an ingredient used in the manufacture of methamphetamine.  Rien initially contacted co-defendant Ronald Banks in an attempt to find a purchaser for the ephedrine.  Negotiations with Banks did not result in a sale, but Banks suggested Rien contact Richard Morgan.  Contact was made with co-defendant Richard Morgan and a meeting was arranged for April 16, 1992, where Morgan was to purchase 110 pounds of ephedrine from Rien for $66,000.  The sale fell through when Morgan appeared with only $6,000 in cash. Morgan explained that there had been a mix-up in his communications with Banks and the sale was not made.

Morgan subsequently paged Rien on May 18, 1992, and another sale was set up for May 20, 1992, wherein Morgan was to pay $33,000 for "one tin" containing 55 pounds of ephedrine.  The meeting took place in a Denny's parking lot at Santa Nella, California.  Rien was accompanied by Agent Robert Pennal of the California Bureau of Narcotics Enforcement (BNE).  Upon arrival at the meeting place, Rien observed Morgan in the parking lot by a silver Oldsmobile, and he saw Kapperman entering the restaurant.  Morgan gave Rien $32,400 in cash, and Rien opened the trunk of his auto and gave Morgan the 55 pound tin of ephedrine.  Morgan took a handful of the ephedrine from the tin and when Kapperman came out of the restaurant Morgan gave the handful of ephedrine to Kapperman for inspection.

During the May 20th transaction, Morgan told Rien that

5

Kapperman was a friend and partner and that the "cooker" lived with Kapperman. The cooker was waiting for Kapperman to get back with the ephedrine because it was going to be processed or cooked that night.

To monitor the activities on May 20th, law enforcement set up surveillance of Morgan's residence in Fresno. The silver Oldsmobile with Kapperman driving and Morgan in the passenger seat was followed from Morgan's residence to an address on West Shields Avenue, the location of Simone Fruit Company owned by the family of co-defendant Anthony Simone. Morgan left the automobile and went inside the main office building, and a few minutes later returned to the vehicle. The vehicle was then followed directly to Santa Nella where the transaction took place, and the vehicle was thereafter followed back to Morgan's Fresno residence. About 30-45 minutes later, Kapperman left Morgan's residence in the same silver Oldsmobile that was driven to Santa Nella. Kapperman was followed to Lancaster, California. While Kapperman was en route to Lancaster, Morgan telephoned Rien and informed Rien that he had provided "his partner" with half of the ephedrine. A short time after Kapperman arrived at the Lancaster premises he departed in the same silver Oldsmobile. He was stopped by investigators a short distance from the Lancaster address, and the car was searched. No ephedrine was found in the car.

Investigation determined that the Oldsmobile was registered to a Thomas E. Kelly. Annette Dowling, who lived at the

6

Lancaster site with Donald Kapperman, indicated that Kapperman, who had been released from prison in May, 1991, had allowed his former cellmate to stay at the residence since early 1992. She identified Farrugia as Kapperman's former cellmate and stated that she knew him only as Tom Kelly.

Both Morgan's residence and the Lancaster premises were secured by law enforcement until search warrants could be obtained by Detective Rien. During the search pursuant to the search warrant, approximately one-half of the ephedrine sold by Detective Rien was recovered in Morgan's Fresno residence, and the remaining half was recovered in a shed on the premises in Lancaster where Kapperman and Farrugia resided.

Testimony by Criminalist Fickies at trial revealed that he examined the shed on the Lancaster premises, and he testified that he observed a number of pieces of scientific apparatus and equipment at the location. Fickies' testimony and photographs of the area introduced during his testimony revealed the following equipment among the items at the site: A pH meter, triple-beam balance scale, two-liter Erlenmeyer, a one-liter Class A volumetric flask, a one-liter round-bottom flask, tubing, condensers, a gas mask, and a hot plate. He also found some chemicals described as liquids and acids and bases, specifically identifying cans of denatured alcohol and acetone, bags of sodium hydroximde beads, a 100 pound barrel of potassium hydroxide, torn-up tin foil, mercuric chloride, possible ephedrine and two large barrels labeled hydrochloric acid. The walls were covered

7

with plastic which would help seal off odors and prevent acid fumes from reacting with the walls of the manufacturing area. These observations together with the presence of the equipment and the ephedrine led Fickies to conclude that the shed was being converted into a clandestine laboratory to manufacture methamphetamine.

Annette Dowling, co-defendant Kapperman's girlfriend, testified that Farrugia rented the shed in Lancaster from Kapperman and that he kept it locked. She stated Farrugia lived at the Lancaster site and identified him as "Tom Kelly." She stated that to her knowledge Farrugia was making wine in the shed.

Farrugia was further tied to the shed when his fingerprints were found on the glassware seized from the Lancaster shed. Also found at the same location were notebooks and other diagrams, chemical notes many bearing entries identified as Farrugia's handwriting by a handwriting expert. One trial exhibit discussed a process to make methamphetamine.

On June 17, 1992, Farrugia was located in Oakley, California. The premises in Oakley were searched and items relating to the Lancaster premises were found. A property receipt from the Lancaster search was found in Oakley, an address book listing Kapperman and Dowling, a purported transfer of ownership of the silver Oldsmobile used by Morgan and Kapperman on May 20, 1992, to purchase the ephedrine, and a declaration by Farrugia regarding his expertise in methamphetamine

8

manufacturing.

Farrugia testified in his own behalf at trial. He admitted he built the laboratory in Lancaster. He stated he had a formula to alter ephedrine to look like methamphetamine, that is, he was making a copycat drug by use of his Formula J, and he believed this activity was legal. He denied having ever met or knowing co-defendants Banks, Simone and Morgan. Farrugia denied any knowledge or involvement in the purchase of the ephedrine by Kapperman and Morgan from Detective Rien, and claimed that he could obtain the ephedrine he needed to produce his copycat drug via mail order for far less than what was paid for the tin purchased from Detective Rien. Farrugia admitted he was at the Lancaster site when investigators arrived to conduct the search but he was not arrested at that time because he hid from the officers.

Farrugia also testified that much of the handwriting in the notes and notebooks seized in the Lancaster search was not his. He identified certain parts of documents as his handwriting, and denied writing others. Defense witness David Garendas testified that a number of the documents seized in the Lancaster search had been written by him. Garendas further testified that he boxed up three or four boxes of laboratory equipment which included glassware, notebooks, books and miscellaneous papers, and the boxes were put into a storage locker in Palmdale in 1984 or 1985.

Farrugia testified that about a month before the search of the Lancaster shed, he helped clean out the storage locker in

9

Palmdale where the items were stored. When he found that the items were going to be discarded, Farrugia asked if he could have them. The items were given to him, and he took them to his premises in Lancaster.

In the Order denying petitioner's Section 2255 motion, the court discussed petitioner's claim that he was denied the effective assistance of counsel because of counsel's failure to analyze the substances seized in connection with the underlying criminal investigation:

> Farrugia claims that counsel's investigation and preparation for trial was ineffective because of his failure to obtain sufficient scientific analysis of the 'suspected meth' seized in the search of the Oakley residence as well as the residue collected from the drainage pit and the glassware at the Lancaster site. He also states that he told counsel that it was imperative that an analysis of the suspected methamphetamine seized in Oakley and the residues from the glassware and sludge pit at Lancaster showing the exact chemical makeup of the samples in order to prove that the substances had been processed in the manner detailed in his Formula J. He also required a synthesis of Formula J. By comparing the results of these two tests, he contends he could show that nothing but his herbal stimulant had ever been processed in Lancaster. Thus, he would have shown that he had a lawful purpose for setting up the lab site in Lancaster, and that the only use of the Lancaster site had been to process ephedrine using his Formula J to make the herbal stimulant which he described as copycat methamphetamine.
>
> Farrugia argues that the expert engaged by his counsel, Dr. Richard Ciula, failed to perform the critical above-described tests. Prior to trial Farrugia's counsel was working with counsel for Kapperman, Daniel Harralson, who had submitted samples of the substance

10

> seized at Oakley to his expert, Dr. Jerry Wilson, for analysis. Farrugia alleges that Dr. Wilson had agreed to perform an analysis that would show that the suspected methamphetamine seized at Oakley was produced using the Formula J process. However, Farrugia states his counsel failed to follow through with Dr. Wilson, and Dr. Ciula did not perform the tests which he relied upon Dr. Wilson to perform. Farrugia claims a reasonably competent counsel would have assured that the critical analyses were done, and that failure to do so was deficient performance.
>
> ...
>
> After reviewing Farrugia's motions, the file, and the transcripts the court concludes that counsel's performance was not deficient. Counsel did not fail to investigate and obtain sufficient analysis of the substances involved in the case. Indeed, counsel first worked with Mr. Harralson to obtain the precise analyses requested by Farrugia. Initially, Dr. Wilson had stated he could break the substances down to determine their exact chemical makeup, but was unable to do so. Farrugia's attorney also attempted to locate someone who could perform that test, but he too was unsuccessful. In his Declaration, Farrugia's counsel states that he and attorney Harralson attempted 'to obtain expert testimony that the ephedrine seized from defendant Farrugia's Oakley residence had been processed in the manner detailed in defendant's exhibit J ... and were unable to locate a chemist who could perform such an analysis.' ... In answer to Farrugia's request for information regarding the attempts to get the tests done precisely as requested by Farrugia, a letter dated November 23, 1994, from Attorney Harralson's office informed Farrugia that most criminal labs can only test for the presence of controlled substances. The letter also states that 'Professor Wilson also said he could be able to do it [break a substance down to determine its exact chemical makeup] and was unable to do all the tests we needed.' ....

11

> However, in preparation for trial, counsel did not rely solely on Dr. Wilson or his ability to obtain certain specific tests. Counsel engaged the services of Dr. Ciula as his defense expert. Dr. Ciula testified that the suspected methamphetamine seized at Oakley was not methamphetamine but simply ephedrine, although it had been processed to look like methamphetamine. A synthesis using Farrugia's Formula J process was performed by Dr. Ciula, and he testified that the reactions produced no change in the start-up material and the resulting product was simply ephedrine in another form. He testified that the Formula J process would not produce methamphetamine. This evidence corroborated Farrugia's version of the purpose of the lab set up in Lancaster, as well s confirming that none of the substances seized either at Oakley or Lancaster were methamphetamine. It also strongly supports Farrugia's position that the substance seized at Oakley was a sample of his herbal stimulant that had been processed by use of his Formula J.
>
> Farrugia claims that he was greatly prejudiced when Kapperman was granted a mistrial because the test results of Kapperman's expert witness, Dr. Wilson, 'became unavailable,' ... The court notes that the testimony by Dr. Ciula precisely tracks the results of the tests performed by Dr. Wilson ... The only test performed by Dr. Wilson which was not done by Dr. Ciula was an analysis of the ephedrine in the 55-pound tin of ephedrine purchased by Morgan and Kapperman. The failure to obtain this test would not prejudice Farrugia at trial; however, its makeup would have an impact at sentencing ....
>
> Counsel also elicited admissions from Government expert witness Terry Fickies, a criminalist and chemist with the California State Laboratory in Sacramento, that no methamphetamine was found at the Lancaster site, and that there was no waste product or sludge in the drainage pit indicating that methamphetamine manufacture had taken place. His analysis of the residue on the glassware found at the site indicated that the

12

> substance was not methamphetamine or even ephedrine, but a plastic or waxy substance. Counsel obtained similar testimony from Government expert witness Mark Kalchik who is with the California State Laboratory in Fresno. Mr. Kalchik testified he tested the residue of a flask found at the Lancaster site and determined that the substance was not any type of a controlled substance.
>
> In addition, Farrugia's counsel also pointed out that experienced law enforcement officers had been mistaken in identifying the substances seized in this case. In his cross-examination of Detective Rien, Farrugia's counsel obtained an admission from this experienced officer that he had mistaken the substances seized at Oakley for methamphetamine ... Moreover, when cross-examined by Mr. Nix, Sgt. Jeff Hollis of the Fresno County Sheriff's Office Narcotics Unit who was present during the search of the Oakley residence and had identified the substance seized there as methamphetamine, was incredulous when informed that the substance was ephedrine and not methamphetamine ....
>
> Thus, although Mr. Nix was unable to obtain the precise tests Farrugia considered important, he did effectively present the same evidence through his defense expert and admissions from the government witnesses during cross-examination.

Also in denying petitioner's Section 2255 motion, the court discussed petitioner's claim of ineffective assistance of counsel at sentencing:

> Farrugia claims that counsel was ineffective for failing to object to the calculation of the amount of methamphetamine that could be produced based upon the presumption that the substance involved was pure ephedrine. He relies on the report of defense expert, Dr. Wilson, which states that the ephedrine was only 50% pure. He contends that his sentence would have been substantially less if the methamphetamine yield had been computed using

13

> Dr. Wilson's test results showing that the ephedrine was only 50% pure.
>
> ...
>
> The Ninth Circuit has consistently held that a § 2255 petitioner cannot challenge nonconstitutional sentencing errors if such errors were not challenged in an earlier proceeding ... A petitioner waives the right to object in collateral proceedings unless a proper objection is made before the district court or on direct appeal ... Computational errors in a presentence report do not give rise to a constitutional issue ... The waiver principle also applies to the determination of the type of drug involved as it would to any other nonconstitutional sentencing issue ... The *McMullen* court also held that counsel was not constitutionally ineffective for failing to raise the issue at sentencing or on appeal ....
>
> Farrugia did not challenge this sentencing issue either in the district court or on direct appeal.  The issue is therefore waived.
>
> In addition, even if counsel's performance had been found to be deficient, Farrugia cannot show prejudice.  As the government correctly points out, assuming the ephedrine was only 50% pure as Farrugia claims, the actual methamphetamine quantity produced would have been 13.25 or 6.2 kilograms (6200 grams).  At the time of Farrugia's sentencing, 100 grams of actual methamphetamine triggered a ten-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(A)(viii), and also triggered the enhancement pursuant to 21 U.S.C. § 851.  The quantity of methamphetamine that could have been produced using the 50% purity figure Farrugia states is correct would result in the same mandatory life sentence.  Thus, Farrugia cannot show prejudice.

Petitioner appealed the denial of his Section 2255 motion.  The court declined to issue a certificate of appealability as did the

14

1  Ninth Circuit by Order filed with this court on May 11, 2001.
2  Thereafter, petitioner unsuccessfully applied to the Ninth
3  Circuit for permission to file a second or successive Section
4  2255 motion.  See Ninth Circuit docket no. 01-71032.

   **B.   Instant Motions**.

6       With regard to petitioner's motions presently pending before
7  this court, the court notes that petitioner filed the motions in
8  pro per, but requests in the motion filed on March 13, 2006 that
9  samples of Government Exhibits 3-A and 5-A be released to
10 attorney, Cheryl Strum.  Ms. Strum was petitioner's counsel in
11 connection with his Section 2255 motion.  However, there is
12 nothing before the court from which it may be inferred that Ms.
13 Strum continues to represent petitioner in connection with the
14 instant motions or in connection with any other matter.

15      In addition, petitioner presents no authority that would
16 allow this court to order the State Bureau of Narcotics
17 Enforcement or California Attorney General Lockyer to release the
18 requested items to petitioner or petitioner's representative in
19 this criminal action.

20      Furthermore, even if the court has the authority to issue
21 the requested orders, petitioner has made no showing that testing
22 of Government Exhibits 3-A or 5-A will establish his "actual
23 innocence" of the crimes of which he was convicted such that the
24 instant motions should be granted.  As noted supra, petitioner's
25 request for retesting of Government Exhibits 3-A and 5-A in
26 connection with the Section 2255 motion was denied.  As noted in

15

the Order denying petitioner's Section 2255 motion, evidence was presented by petitioner at his jury trial that petitioner's Formula J made a copycat drug that altered ephedrine to look like methamphetamine, that the suspected methamphetamine seized at petitioner's Oakley residence was not methamphetamine but ephedrine processed to look like methamphetamine, that a synthesis using petitioner's Formula J process was performed by petitioner's expert witness, who testified that the resulting process was simply ephedrine in another form and who testified that petitioner's Formula J would not produce methamphetamine. Notwithstanding this evidence and the other evidence described in the Order denying petitioner's Section 2255 motion, the jury did not believe petitioner or petitioner's expert witness.

As explained in Ivy v. Pontesso, 328 F.3d 1057, 1059-1060 (9th Cir. 2003):

> 'In general, § 2255 provides the exclusive procedural mechanism by which a federal prisoner may test the legality of his detention.' ... However, a prisoner may proceed under § 2241 if he can show that 'the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.' ... This Court has not fully explained when § 2255's remedy is 'inadequate or ineffective.' ... However, we have stated that this exception is narrow ... and that § 2255's remedy is not 'inadequate or ineffective' merely because § 2255's gatekeeping provisions prevent the petitioner from filing a second or successive petition ....
> ...
> We have not had occasion to decide when a claim of actual innocence entitles a petitioner who is procedurally barred from

16

> filing a second or successive motion under § 2255 to seek relief under § 2241. Our sister circuits, however, have held that § 2255 provides an 'inadequate or ineffective' remedy (and thus the petitioner may proceed under § 2241) when the petitioner claims to be: (1) legally innocent of the crime for which he has been convicted; and (2) has never had an 'unobstructed procedural shot' at presenting this claim ... In other words, it is not enough that the petitioner is presently barred from raising his claim of innocence by motion under § 2255. He must never have had the opportunity to raise it by motion.

As noted, petitioner's request that this court order the testing of the chemical exhibits has been made by petitioner repeatedly, including a number of times prior to trial and after trial. All such requests were denied. Petitioner did not appeal the denial of his pre-trial requests to compel the testing of Government chemical exhibits. As noted, petitioner again moved for re-testing of the Government's chemical exhibits in connection with his Section 2255 petition, which motion was denied. Therefore, petitioner has not made a showing of "actual innocence" that would allow him to file a motion under Rule 60(b), Federal Rules of Civil Procedure, to vacate the judgment denying the Section 2255 motion or would allow petitioner to file a motion for relief pursuant to 28 U.S.C. § 2241 pursuant to Ivy v. Pontesso.

ACCORDINGLY:

1.  Petitioner's "Motion Seeking a Court 'Order' for the Thorough Testing of the Government's Trial Exhibits 3-A & 5-A, (Which the Government Finally Located in the Possession of the California Department of Justice - Bureau of Narcotics),

17

1  Petitioner Can and Will Support His Actual Innocence Claims with
2  the Chemical Tests Results of 3-A & 5-A" is denied;
3       2.  Petitioner's "Motion for Court Order Release of Samples
4  of Trial Exhibits 3-A and 5-A from the California Bureau of
5  Narcotic Enforcement, (BNE), to Attorney Cheryl Strum for the
6  Purpose of Having Them Analyzed to Determine Their Exact Chemical
7  Make-Up to Establish Movants Actual Innocence" is denied; and
8       3.  Petitioner's "Motion for Court Order to the California
9  State Attorney General, Bill Lockyer, to Produce Copies of the
10 Material Safety Data Sheet, Packaging & Product Information
11 Telling the Chemical Make-Up & Content of the 55 Lb Tins of
12 Ephedrine Provided By & Stored in the Evidence Vault of the State
13 Bureau or Narcotic Enforcement & Used in this Case as '<u>Trial</u>
14 <u>Exhibit 3-A</u>'" is denied.
15    IT IS SO ORDERED.
16 **Dated:  May 9, 2006**              /s/ Robert E. Coyle
   668554                          UNITED STATES DISTRICT JUDGE