1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT FOR THE

7                         EASTERN DISTRICT OF CALIFORNIA

8

9   THOMAS FARRUGIA,              )        No. CV-F-98-5252 OWW
                                  )        (No. CR-F-92-5164)
10                                )
                                  )        ORDER DENYING PETITIONER'S
11              Petitioner,       )        "MOTION TO EXPAND THE RECORD
                                  )        WITH SWORN AFFIDAVITS,
12        vs.                     )        STATEMENTS AND DOCUMENTS
                                  )        THAT SUPORT [SIC] MOVANT'S
13                                )        ACTUAL INNOCENCE" (Doc. 895)
    UNITED STATES OF AMERICA,     )        AND DENYING PETITIONER'S
14                                )        "MOTION TO RE-OPEN SECTION
                                  )        2255 PROCEEDINGS PURSUANT TO
15              Respondent.       )        FED. R. CIV. P. 60(b)(6)"
                                  )        (Doc. 898)
16  _____)

17

18

19

20        On August 1, 2007, Petitioner Thomas Farrugia, proceeding *in

21  pro per*, filed a "Motion to Expand the Record With Sworn

22  Affidavits, Statements and Documents That Suport [sic] Movant's

23  Actual Innocence" (Doc. 895).  On September 24, 2007, Petitioner

24  filed a "Motion to Re-open Section 2255 Proceedings Pursuant to

25  Fed. R. Civ. P. 60(b)(6)" (Doc. 898).

        A.   Background.

26

                                     1

Petitioner and four co-defendants, Anthony Simone, Jr., Richard Lee Morgan, Ronald Banks, and Donald Kapperman, were charged with conspiracy and drug trafficking in *United States v. Simone, et al.,* No. CR-F-92-5164.  Petitioner was charged with one count of conspiracy to manufacture methamphetamine and one count of possession of a listed chemical with the intent to manufacture a controlled substance.   All co-defendants but Petitioner and co-defendant Donald Kapperman pleaded guilty. Prior to trial, Petitioner, acting *in pro per*, filed a number of motions for re-testing of the Government's chemical exhibits to determine their exact chemical make-up (Docs. 141, 268, 386, 432).  These motions were denied because petitioner was represented by counsel.  (Docs. 151, 394, 439).  Petitioner and Kapperman proceeded to trial.  A mistrial was declared with regard to Kapperman but the trial continued as to Petitioner and the jury returned a guilty verdict on both counts.  Following his conviction, Petitioner, again acting *in pro per*, filed a number of motions seeking to compel the re-testing of the Government's chemical exhibits to determine their exact chemical make-up (Docs. 470, 477, 515).  These motions again were denied (Docs. 543, 553).  Petitioner then appealed his conviction and sentence to the Ninth Circuit.  Petitioner's conviction was affirmed by the Ninth Circuit.  *United States v. Farrugia*, 1996 WL 403026 (9th Cir. 1996).  Petitioner did not contend on direct appeal that the denials of his various motions to compel the re-testing of the Government's chemical exhibits was error.

2

On March 16, 1998, petitioner filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 (Doc. 757).  On April 6, 1998, petitioner again filed a motion for the thorough testing of seized chemical samples and Government exhibits to determine their exact chemical make-up and for a stay or continuance of the Section 2255 motion pending the results of those tests (Doc. 768).  This motion for retesting was denied, the court ruling that it would not order retesting of trial exhibits 3-A and 5-A.  (Doc. 771).  Petitioner filed a first amended Section 2255 motion on January 25, 1999.  (Doc. 789).  Thereafter, counsel was appointed to represent Petitioner and was granted leave to file a second amended Section 2255 motion.  The second amended Section 2255 motion was filed on March 23, 1999. (Doc. 803).

In the Order denying petitioner's Section 2255 motion filed on October 10, 2000 (Doc. 823), the factual background to Petitioner's conviction is set forth.  The factual background is adopted herein.

Detective Toby Rien of the Fresno County Sheriff's Office posed as an illicit seller of ephedrine which is an ingredient used in the manufacture of methamphetamine.  Rien initially contacted co-defendant Ronald Banks in an attempt to find a purchaser for the ephedrine.  Negotiations with Banks did not result in a sale, but Banks suggested Rien contact Richard Morgan.  Contact was made with co-defendant Richard Morgan and a meeting was arranged for April 16, 1992, where Morgan was to

purchase 110 pounds of ephedrine from Rien for $66,000.  The sale
fell through when Morgan appeared with only $6,000 in cash.
Morgan explained that there had been a mix-up in his
communications with Banks and the sale was not made.

Morgan subsequently paged Rien on May 18, 1992, and another
sale was set up for May 20, 1992, wherein Morgan was to pay
$33,000 for "one tin" containing 55 pounds of ephedrine.  The
meeting took place in a Denny's parking lot at Santa Nella,
California.  Rien was accompanied by Agent Robert Pennal of the
California Bureau of Narcotics Enforcement (BNE).  Upon arrival
at the meeting place, Rien observed Morgan in the parking lot by
a silver Oldsmobile, and he saw Kapperman entering the
restaurant.  Morgan gave Rien $32,400 in cash, and Rien opened
the trunk of his auto and gave Morgan the 55 pound tin of
ephedrine.  Morgan took a handful of the ephedrine from the tin
and when Kapperman came out of the restaurant Morgan gave the
handful of ephedrine to Kapperman for inspection.

During the May 20th transaction, Morgan told Rien that
Kapperman was a friend and partner and that the "cooker" lived
with Kapperman.  The cooker was waiting for Kapperman to get back
with the ephedrine because it was going to be processed or cooked
that night.

To monitor the activities on May 20th, law enforcement set
up surveillance of Morgan's residence in Fresno.  The silver
Oldsmobile with Kapperman driving and Morgan in the passenger
seat was followed from Morgan's residence to an address on West

4

Shields Avenue, the location of Simone Fruit Company owned by the family of co-defendant Anthony Simone.  Morgan left the automobile and went inside the main office building, and a few minutes later returned to the vehicle.  The vehicle was then followed directly to Santa Nella where the transaction took place, and the vehicle was thereafter followed back to Morgan's Fresno residence.  About 30-45 minutes later, Kapperman left Morgan's residence in the same silver Oldsmobile that was driven to Santa Nella.  Kapperman was followed to Lancaster, California. While Kapperman was en route to Lancaster, Morgan telephoned Rien and informed Rien that he had provided "his partner" with half of the ephedrine. A short time after Kapperman arrived at the Lancaster premises he departed in the same silver Oldsmobile.  He was stopped by investigators a short distance from the Lancaster address, and the car was searched.  No ephedrine was found in the car.

Investigation determined that the Oldsmobile was registered to a Thomas E. Kelly.  Annette Dowling, who lived at the Lancaster site with Donald Kapperman, indicated that Kapperman, who had been released from prison in May, 1991, had allowed his former cellmate to stay at the residence since early 1992.  She identified Farrugia as Kapperman's former cellmate and stated that she knew him only as Tom Kelly.

Both Morgan's residence and the Lancaster premises were secured by law enforcement until search warrants could be obtained by Detective Rien.  During the search pursuant to the

search warrant, approximately one-half of the ephedrine sold by
Detective Rien was recovered in Morgan's Fresno residence, and
the remaining half was recovered in a shed on the premises in
Lancaster where Kapperman and Farrugia resided.

Testimony by Criminalist Fickies at trial revealed that he
examined the shed on the Lancaster premises, and he testified
that he observed a number of pieces of scientific apparatus and
equipment at the location.  Fickies' testimony and photographs of
the area introduced during his testimony revealed the following
equipment among the items at the site: A pH meter, triple-beam
balance scale, two-liter Erlenmeyer, a one-liter Class A
volumetric flask, a one-liter round-bottom flask, tubing,
condensers, a gas mask, and a hot plate.  He also found some
chemicals described as liquids and acids and bases, specifically
identifying cans of denatured alcohol and acetone, bags of sodium
hydroximde beads, a 100 pound barrel of potassium hydroxide,
torn-up tin foil, mercuric chloride, possible ephedrine and two
large barrels labeled hydrochloric acid.  The walls were covered
with plastic which would help seal off odors and prevent acid
fumes from reacting with the walls of the manufacturing area.
These observations together with the presence of the equipment
and the ephedrine led Fickies to conclude that the shed was being
converted into a clandestine laboratory to manufacture
methamphetamine.

Annette Dowling, co-defendant Kapperman's girlfriend,
testified that Farrugia rented the shed in Lancaster from

Kapperman and that he kept it locked.  She stated Farrugia lived at the Lancaster site and identified him as "Tom Kelly."  She stated that to her knowledge Farrugia was making wine in the shed.

Farrugia was further tied to the shed when his fingerprints were found on the glassware seized from the Lancaster shed.  Also found at the same location were notebooks and other diagrams, chemical notes many bearing entries identified as Farrugia's handwriting by a handwriting expert.  One trial exhibit discussed a process to make methamphetamine.

On June 17, 1992, Farrugia was located in Oakley, California.  The premises in Oakley were searched and items relating to the Lancaster premises were found.  A property receipt from the Lancaster search was found in Oakley, an address book listing Kapperman and Dowling, a purported transfer of ownership of the silver Oldsmobile used by Morgan and Kapperman on May 20, 1992, to purchase the ephedrine, and a declaration by Farrugia regarding his expertise in methamphetamine manufacturing.

Farrugia testified in his own behalf at trial.  He admitted he built the laboratory in Lancaster.  He stated he had a formula to alter ephedrine to look like methamphetamine, that is, he was making a copycat drug by use of his Formula J, and he believed this activity was legal.  He denied having ever met or knowing co-defendants Banks, Simone and Morgan.  Farrugia denied any knowledge or involvement in the purchase of the ephedrine by

7

Kapperman and Morgan from Detective Rien, and claimed that he could obtain the ephedrine he needed to produce his copycat drug via mail order for far less than what was paid for the tin purchased from Detective Rien.  Farrugia admitted he was at the Lancaster site when investigators arrived to conduct the search but he was not arrested at that time because he hid from the officers.

Farrugia also testified that much of the handwriting in the notes and notebooks seized in the Lancaster search was not his. He identified certain parts of documents as his handwriting, and denied writing others.  Defense witness David Garendas testified that a number of the documents seized in the Lancaster search had been written by him.  Garendas further testified that he boxed up three or four boxes of laboratory equipment which included glassware, notebooks, books and miscellaneous papers, and the boxes were put into a storage locker in Palmdale in 1984 or 1985.

Farrugia testified that about a month before the search of the Lancaster shed, he helped clean out the storage locker in Palmdale where the items were stored.  When he found that the items were going to be discarded, Farrugia asked if he could have them.  The items were given to him, and he took them to his premises in Lancaster.

In the October 10, 2000 Order denying Petitioner's Section 2255 motion, the Court discussed Petitioner's claim of ineffective assistance of counsel because of counsel's failure to interview and investigate witnesses:

Farrugia contends that counsel failed to interview and subpoena witnesses who could have testified that he was not part of the conspiracy charged in this case.  He alleges that Richard Morgan, Ronald Banks, Anthony Simone and Donald Kapperman, his co-defendants, were all willing to testify at his trial and that his counsel failed to interview and call these witnesses despite his stated desire to have them testify.

Farrugia has provided signed statements from Ronald Banks and Donald Kapperman, and an affidavit from Anthony Simone.  There is no statement from Morgan indicating whether or not he was available or willing to testify. The Banks and Simone statements each contain statements that they did not know Farrugia before the events at issue here and that neither of them was involved in any conspiracy with Farrugia.  Both Banks and Simone state that Farrugia's attorney did not interview them prior to trial.

Farrugia has provided a copy of a letter dated April 19, 1993, from Kapperman addressed to the trial judge wherein Kapperman states that he would be willing to testify as a defense witness for Farrugia in a separate trial.  He also has submitted another unsworn declaration entitled Affidavit dated January 25, 1996, wherein Kapperman indicates that he had been willing to testify for Farrugia.  He states he would have testified that Farrugia had no knowledge of the ephedrine purchase from Morgan, and that Farrugia never had possession of or access to the ephedrine.  He also states that he could have testified to the events that transpired between Kapperman and Morgan, as well as 'what had transpired away from under-cover agents and Mr. Farrugia.' ... A third purported affidavit dated August 11, 1997, is submitted wherein Kapperman states his version of the events which transpired at the Denny's Restaurant at Santa Nella on May 20, 1992.  Kapperman states that Morgan did not hand any ephedrine to him to examine in the parking lot.  Rather, Morgan handed him the keys to the car.

Farrugia argues that he has shown that Kapperman was available and willing to testify and alleges that his counsel did not call Kapperman as a witness as a professional courtesy to Kapperman's attorney and because he did not wish to cause any inconvenience or discomfort to Kapperman's attorney.

In response to this claim, the Government contends that its theory of the case was that Farrugia was to be the actual manufacturer or cooker of the methamphetamine.  In this conspiracy, the only co-defendant who interacted with Farrugia was Kapperman. Thus, the testimony of any other co-defendant was unlikely to be of assistance to the defense.  Prior to Farrugia's trial, Simone, Banks and Morgan had all plead guilty to methamphetamine related offenses arising from the events in this investigation.  The guilty pleas as well as the witnesses' prior records would have been highlighted during the Government's cross-examination had these defendants testified.  The Government therefore argues that counsel's decision not to call these witnesses, and instead to elicit this information through Farrugia was a tactical decision that was well within the scope of professional competence.

With regard to Kapperman, the Government argues that Farrugia has not shown that Kapperman was actually available for testimony.  As noted above, Kapperman was granted a mistrial on the first day of trial, and Farrugia's trial continued with Farrugia as the only defendant.  The Government points out that Kapperman chose not to testify at his own trial which occurred in September, 1994, three months after Farrugia's trial. Kapperman was with Morgan when he purchased the ephedrine and Morgan told the undercover officer that Kapperman was his partner, that the cooker lived with Kapperman, and that the ephedrine would be used to manufacture methamphetamine.  Further, Kapperman also had a criminal record, and this would have been brought out in cross-examination.

The Government provides a Declaration from Barry F. Nix, counsel for Farrugia, in which

10

he states that he interviewed a number of
persons to prepare for trial.  He states that
he interviewed Anthony Simone, Jr. and Ronald
Banks, and determined that they would not be
helpful to the defense.

He states that he did not interview Richard
Morgan, as he was represented by counsel and
he did not believe his counsel would be
amenable to such an interview.  He states
that he did receive Morgan's statements in
discovery, and did not believe that Morgan's
version of the events would be helpful to the
defense.

As to Kapperman, Mr. Nix states that
Kapperman was represented by Attorney Daniel
Harralson, and that Harralson did not wish
for Kapperman to testify on Farrugia's
behalf.

...

After careful review of the entire record,
including the transcripts, and consideration
of the motion and response, the court
concludes that counsel's performance was not
deficient for failing to call co-defendants
Simone, Banks, Morgan and Kapperman to
testify.  Even if the court had concluded
that counsel's performance was deficient, the
court finds that Farrugia cannot show
prejudice.

As to Simone, Banks and Morgan, it is clear
that the decision not to call these witnesses
was a tactical decision.  This is not a case
where counsel failed to investigate or
consider these witnesses.  Counsel determined
not to call them after reviewing the
discovery, interviewing a number of potential
witnesses and considering their effect in
defense of his client.  Further, the fact
that these co-defendants did not know
Farrugia is not fatal to proof that Farrugia
was a member of the conspiracy.  Even if
Farrugia did not directly conspire with all
of the other conspirators in the overall
scheme, he can be found a part of the
conspiracy if he directly conspired with one
of the conspirators to carry out at least one

11

of the objects of the conspiracy.

One may become a member of the conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members. 'In order to be a coconspirator, one need not know all the purposes of an participants in the conspiracy.'  *United States v. Escalante,* 637 F.2d 1197, 1200 (9th Cir.1980); *United States v. Vaughn*, 797 F.2d 1485, 1492 (9th Cir.1986).  The government presented no evidence that Farrugia knew or had any contact with Banks, Simone or Morgan, so such testimony was unnecessary to refute any government evidence to the contrary. Moreover, defense counsel presented this information to the jury when, on two occasions while Farrugia was on the witness stand, he elicited testimony from Farrugia that he had never met nor did he know Banks, Simone and Morgan.  Reporter's transcript (RT) 341, 379-80.  Thus, the court concludes that the decision not to call these witnesses was a reasonable tactical decision and not deficient performance.

The court notes that both Banks' and Simone's statements indicate that Mr. Nix did not interview them about the case prior to the trial.  In his Declaration, Barry Nix declares that he interviewed both Banks and Simone and determined that their testimony would not be helpful to the defense.  A hearing to resolve this conflict is unnecessary.  It is clear that even assuming counsel failed to interview Banks and Simone, Farrugia cannot show prejudice.  Both co-defendants proposed to provide evidence that they did not know Farrugia and, that, to their knowledge, he was unknown to Morgan as well.  As stated above, it is unnecessary for the Government to prove that the co-conspirators knew the names, identities or locations of all the other members of the conspiracy.  Therefore, their testimony could not have changed the outcome of the case, and no prejudice resulted.

With regard to co-defendant Kapperman, Farrugia states that Kapperman was in federal

custody in Fresno and was ready and willing to testify.  He alleges that Kapperman would have refuted Morgan's statement to Detective Rien that the 'cook' lived with Kapperman. Kapperman also would have confirmed that the ephedrine seized from the Lancaster shed belonged to Kapperman alone.  Farrugia also alleges that Kapperman would have testified he was present at the ephedrine buy with Morgan only to get security for money owed to him by Morgan, and that Farrugia was completely unaware of the agreement between Kapperman and Morgan.  He would have testified that Farrugia had nothing to do with the offense and that the shed in Lancaster was used to make the 'Kapperman/Farrugia Formula "J" herbal stimulant.'  First Amended Motion, p. 51.

In support of his claim that Kapperman was available and willing to testify on his behalf Farrugia provides three documents signed by Kapperman.  The first is a letter addressed to the trial court judge dated April 19, 1993, wherein Kapperman states that he would be willing to testify on behalf of Farrugia in a separate trial.  Exhibit S, Appendix to First Amended Complaint [sic]. The letter does not indicate what the predicted testimony would be or the possible weight and credibility of the testimony or even if the testimony would be exculpatory or incriminatory.  Two additional statements by Kapperman dated January 26, 1996, and August 11, 1997, set out facts which Kapperman states he would have testified about had he been called as a witness.  Exhibits T & U, Appendix to First Amended Complaint [sic].

The court has reviewed the record and concludes that counsel made an informed and reasonable strategic decision when he determined to defend this case without Kapperman's testimony.  Farrugia concedes that counsel interviewed Kapperman and had him under subpoena.  However, contrary to Farrugia's claim, Kapperman's testimony was not entirely exculpatory and carried with it recognizable risks of which counsel was fully aware.

The record contains two separate motions for severance of Farrugia's trial from that of Kapperman.  The first motion dated May 3, 1993, stated that Kapperman had indicated a willingness to testify at a separate trial, and that unless severance were granted, Farrugia would be deprived of exculpatory testimony from Kapperman.  The second motion filed on January 18, 1994, sought severance because at trial the government intended to use statements made by Kapperman to co-defendant Morgan which implicated Farrugia. Both motions were denied, as was Kapperman's motion seeking severance from Farrugia's trial.

Thus, the record demonstrates that counsel was cognizant of both the exculpatory and incriminatory aspects of any potential testimony by Kapperman.  Whether or not Kapperman testified, the statements made by Morgan to the undercover agent implicating Kapperman and Farrugia were admissible.  *See* Order, March 21, 1994 (Doc. # 395).  In addition, if Kapperman testified, he would have been subject to cross-examination concerning his own drug dealing activities in connection with this case as well as his extensive prior criminal record.

The court must view the record from counsel's perspective at the time the events occurred. A review of the record shows that counsel was able to present the evidence that would have come in by way of Kapperman's testimony through other witnesses, including Farrugia himself.  In his cross-examination of Fresno County Sheriff's Detective Toby Rien, counsel established that the Lancaster site did not fit Morgan's description of the intended methamphetamine manufacturing site.  Morgan stated the lab was four to five hours from Fresno in a house with the walls removed and air conditioners installed in the ceiling. Rien testified that Morgan referred to some other individuals involved as being out of Las Vegas and described them as being 60 years old.  This testimony supported Farrugia's contention that the Lancaster site was not the methamphetamine laboratory which Morgan referred to and that Farrugia could

14

not be the 'cooker' Morgan described.  R.T.
54-56.

Farrugia contends that Kapperman would have
testified that he and Kapperman had an
agreement to produce a legal stimulant from
legally obtained mail-order ephedrine that
looked like, smelled like and had some of the
effects of methamphetamine, but it was not
methamphetamine.  He contends that this
testimony was critical, as it would have
corroborated his testimony about obtaining
mail-order ephedrine and production of the
stimulant using his Formula J.

Although Farrugia argues that the existence
of this agreement was one of the most
important aspects of his intended defense,
nowhere in any of Kapperman's statements -
not in the one pretrial statement nor in
either of the post-trial statements - does
Kapperman make reference to any such
agreement between the two.

Farrugia also argues that Kapperman's
testimony would have contradicted Morgan's
statement that Kapperman had a
methamphetamine 'cook' living with him.
Again, nowhere in any of the statements
provided by Kapperman does he state that he
could or would have testified that he did not
make this statement to Morgan, nor does he
acknowledge the statement was made but
declare that he was not referring to Farrugia
but to another person.

Kapperman's other statements, e.g., that
Farrugia had no knowledge of the sale of the
ephedrine to Morgan and no access to or
control of the ephedrine purchased by Morgan,
are contradicted by evidence in the record.
Kapperman himself delivered half of the
ephedrine purchased by Morgan to Lancaster
and stored it in the shed rented by Farrugia.
The evidence presented showed that Farrugia
rented the space from Kapperman.  Indeed,
Annette Dowling, Kapperman's girlfriend,
stated that Farrugia lived at the Lancaster
site.  By his own admission, Farrugia was
present when law enforcement officers
searched the Lancaster site, but hid to avoid

detection.   Glassware and documents related
to the methamphetamine manufacture seized
from the Lancaster site had both Kapperman's
and Farrugia's fingerprintes and/or
signatures.

Kapperman's testimony would have been further
undermined when it was revealed that he had
been Farrugia's cellmate while they were
incarcerated for previous drug convictions.
Farrugia was known to Annette Dowling as Tom
Kelly, a fictitious name used by Farrugia.
Kapperman and Morgan transported the
ephedrine from Santa Nella to Morgan's Fresno
residence and Kapperman thereafter
transported half of the ephedrine on to
Lancaster in a silver Oldsmobile registered
to Tom Kelly.  This vehicle was later
observed at the Oakley address where Farrugia
was arrested.

The court concludes that counsel's decision
not to call Kapperman to testify and to
present his defense of Farrugia through other
witnesses was an informed strategic decision.
Even if the court were to find deficient
performance for failure to call Kapperman,
Farrugia cannot show prejudice as the
evidence was presented to the jury through
cross-examination of Government witnesses,
the defense witnesses and Farrugia himself.

Farrugia also claims that Annette Dowling and
her children Kevin and Kelly Dowling lived at
the Lancaster site and their testimony would
have established that he had a legal source
for ephedrine at a reasonable price and that
it was used for his herbal stimulant.  He
states that Annette and Kelly assisted him in
legally obtaining ephedrine pills through the
mail by using their credit cards, and that
they knew it was for the purpose of
processing his Formula J product.  He further
claims that Annette, Kevin and Kelly sampled
the product.  First Amended Motion, p. 63.

The record does not support Farrugia's
claims.  Annette Dowling was subpoenaed by
the government.  She testified on direct
examination that Farrugia was known to her
only as Tom Kelly, that he had rented the

16

garage-type building at Lancaster and had been living there about two months before the search on May 20, 1992.  She testified that she did not enter the building after it was rented as it was locked, and that when she asked Kapperman why Farrugia moved into the shed she was told to mind her own business. She stated that the only thing she knew was that he was making wine because he kept it in the refrigerator in the garage.  She was also cross-examined by Farrugia's counsel.  RT 204-211.  Contrary to the allegations in Farrugia's motion, nowhere in the record is there any suggestion that she obtained ephedrine pills for Farrugia as he claims, nor is there any testimony that she had knowledge of the herbal-stimulant venture and that she had sampled the Formula J product as Farrugia claims in his motion.

In the October 10, 2000 Order denying Petitioner's Section 2255 motion, the Court discussed petitioner's claim that he was denied the effective assistance of counsel because of counsel's failure to analyze the substances seized in connection with the underlying criminal investigation:

Farrugia claims that counsel's investigation and preparation for trial was ineffective because of his failure to obtain sufficient scientific analysis of the 'suspected meth' seized in the search of the Oakley residence as well as the residue collected from the drainage pit and the glassware at the Lancaster site.  He also states that he told counsel that it was imperative that an analysis of the suspected methamphetamine seized in Oakley and the residues from the glassware and sludge pit at Lancaster showing the exact chemical makeup of the samples in order to prove that the substances had been processed in the manner detailed in his Formula J.  He also required a synthesis of Formula J.  By comparing the results of these two tests, he contends he could show that nothing but his herbal stimulant had ever been processed in Lancaster.  Thus, he would have shown that he had a lawful purpose for

17

setting up the lab site in Lancaster, and
that the only use of the Lancaster site had
been to process ephedrine using his Formula J
to make the herbal stimulant which he
described as copycat methamphetamine.

Farrugia argues that the expert engaged by
his counsel, Dr. Richard Ciula, failed to
perform the critical above-described tests.
Prior to trial Farrugia's counsel was working
with counsel for Kapperman, Daniel Harralson,
who had submitted samples of the substance
seized at Oakley to his expert, Dr. Jerry
Wilson, for analysis.  Farrugia alleges that
Dr. Wilson had agreed to perform an analysis
that would show that the suspected
methamphetamine seized at Oakley was produced
using the Formula J process.  However,
Farrugia states his counsel failed to follow
through with Dr. Wilson, and Dr. Ciula did
not perform the tests which he relied upon
Dr. Wilson to perform.  Farrugia claims a
reasonably competent counsel would have
assured that the critical analyses were done,
and that failure to do so was deficient
performance.

...

After reviewing Farrugia's motions, the file,
and the transcripts the court concludes that
counsel's performance was not deficient.
Counsel did not fail to investigate and
obtain sufficient analysis of the substances
involved in the case.  Indeed, counsel first
worked with Mr. Harralson to obtain the
precise analyses requested by Farrugia.
Initially, Dr. Wilson had stated he could
break the substances down to determine their
exact chemical makeup, but was unable to do
so.  Farrugia's attorney also attempted to
locate someone who could perform that test,
but he too was unsuccessful.  In his
Declaration, Farrugia's counsel states that
he and attorney Harralson attempted 'to
obtain expert testimony that the ephedrine
seized from defendant Farrugia's Oakley
residence had been processed in the manner
detailed in defendant's exhibit J ... and
were unable to locate a chemist who could
perform such an analysis.' ... In answer to

18

Farrugia's request for information regarding the attempts to get the tests done precisely as requested by Farrugia, a letter dated November 23, 1994, from Attorney Harralson's office informed Farrugia that most criminal labs can only test for the presence of controlled substances.  The letter also states that 'Professor Wilson also said he could be able to do it [break a substance down to determine its exact chemical makeup] and was unable to do all the tests we needed.' ....

However, in preparation for trial, counsel did not rely solely on Dr. Wilson or his ability to obtain certain specific tests. Counsel engaged the services of Dr. Ciula as his defense expert.  Dr. Ciula testified that the suspected methamphetamine seized at Oakley was not methamphetamine but simply ephedrine, although it had been processed to look like methamphetamine.  A synthesis using Farrugia's Formula J process was performed by Dr. Ciula, and he testified that the reactions produced no change in the start-up material and the resulting product was simply ephedrine in another form.  He testified that the Formula J process would not produce methamphetamine.  This evidence corroborated Farrugia's version of the purpose of the lab set up in Lancaster, as well as confirming that none of the substances seized either at Oakley or Lancaster were methamphetamine.  It also strongly supports Farrugia's position that the substance seized at Oakley was a sample of his herbal stimulant that had been processed by use of his Formula J.

Farrugia claims that he was greatly prejudiced when Kapperman was granted a mistrial because the test results of Kapperman's expert witness, Dr. Wilson, 'became unavailable,' ... The court notes that the testimony by Dr. Ciula precisely tracks the results of the tests performed by Dr. Wilson ... The only test performed by Dr. Wilson which was not done by Dr. Ciula was an analysis of the ephedrine in the 55-pound tin of ephedrine purchased by Morgan and Kapperman.  The failure to obtain this test would not prejudice Farrugia at trial;

19

1          however, its makeup would have an impact at
           sentencing ....
2
           Counsel also elicited admissions from
3          Government expert witness Terry Fickies, a
           criminalist and chemist with the California
4          State Laboratory in Sacramento, that no
           methamphetamine was found at the Lancaster
5          site, and that there was no waste product or
           sludge in the drainage pit indicating that
6          methamphetamine manufacture had taken place.
           His analysis of the residue on the glassware
7          found at the site indicated that the
           substance was not methamphetamine or even
8          ephedrine, but a plastic or waxy substance.
           Counsel obtained similar testimony from
9          Government expert witness Mark Kalchik who is
           with the California State Laboratory in
10         Fresno.  Mr. Kalchik testified he tested the
           residue of a flask found at the Lancaster
11         site and determined that the substance was
           not any type of a controlled substance.
12
           In addition, Farrugia's counsel also pointed
13         out that experienced law enforcement officers
           had been mistaken in identifying the
14         substances seized in this case.  In his
           cross-examination of Detective Rien,
15         Farrugia's counsel obtained an admission from
           this experienced officer that he had mistaken
16         the substances seized at Oakley for
           methamphetamine ... Moreover, when cross-
17         examined by Mr. Nix, Sgt. Jeff Hollis of the
           Fresno County Sheriff's Office Narcotics Unit
18         who was present during the search of the
           Oakley residence and had identified the
19         substance seized there as methamphetamine,
           was incredulous when informed that the
20         substance was ephedrine and not
           methamphetamine ....
21
           Thus, although Mr. Nix was unable to obtain
22         the precise tests Farrugia considered
           important, he did effectively present the
23         same evidence through his defense expert and
           admissions from the government witnesses
24         during cross-examination.

25      In the October 10, 2000 Order denying Petitioner's Section

26  2255 motion, the Court also  discussed Petitioner's claim of

                                20

ineffective assistance of counsel at sentencing:

> Farrugia claims that counsel was ineffective
> for failing to object to the calculation of
> the amount of methamphetamine that could be
> produced based upon the presumption that the
> substance involved was pure ephedrine.  He
> relies on the report of defense expert, Dr.
> Wilson, which states that the ephedrine was
> only 50% pure.  He contends that his sentence
> would have been substantially less if the
> methamphetamine yield had been computed using
> Dr. Wilson's test results showing that the
> ephedrine was only 50% pure.
>
> ...
>
> The Ninth Circuit has consistently held that
> a § 2255 petitioner cannot challenge
> nonconstitutional sentencing errors if such
> errors were not challenged in an earlier
> proceeding ... A petitioner waives the right
> to object in collateral proceedings unless a
> proper objection is made before the district
> court or on direct appeal ... Computational
> errors in a presentence report do not give
> rise to a constitutional issue ... The waiver
> principle also applies to the determination
> of the type of drug involved as it would to
> any other nonconstitutional sentencing issue
> ... The *McMullen* court also held that counsel
> was not constitutionally ineffective for
> failing to raise the issue at sentencing or
> on appeal ....
>
> Farrugia did not challenge this sentencing
> issue either in the district court or on
> direct appeal.  The issue is therefore
> waived.
>
> In addition, even if counsel's performance
> had been found to be deficient, Farrugia
> cannot show prejudice.  As the government
> correctly points out, assuming the ephedrine
> was only 50% pure as Farrugia claims, the
> actual methamphetamine quantity produced
> would have been 13.25 or 6.2 kilograms (6200
> grams).  At the time of Farrugia's
> sentencing, 100 grams of actual
> methamphetamine triggered a ten-year
> mandatory minimum sentence pursuant to 21

U.S.C. § 841(b)(1)(A)(viii), and also
triggered the enhancement pursuant to 21
U.S.C. § 851.  The quantity of
methamphetamine that could have been produced
using the 50% purity figure Farrugia states
is correct would result in the same mandatory
life sentence.  Thus, Farrugia cannot show
prejudice.

Petitioner appealed the denial of his Section 2255 motion. The Court declined to issue a certificate of appealability as did the Ninth Circuit by Order filed with this court on May 11, 2001. Thereafter, petitioner unsuccessfully applied to the Ninth Circuit for permission to file a second or successive Section 2255 motion.  <u>See</u> Ninth Circuit docket no. 01-71032.

B.   <u>Motion to Re-Open Section 2255 Proceedings</u>.

Petitioner moves pursuant to Rule 60(b)(6), Federal Rules of Civil Procedure, "to re-open his section 2255 proceedings to enable him to invoke the discovery process available under the Rules Governing Section 2255 Proceedings; Federal Rules of Criminal Procedure, and Federal Rules of Civil Procedure, to conduct forensic testing on certain an [sic] specific evidence which will enable movant to establish his actual innocence of the charges for which he currently stands convicted."

On January 9, 2006, in No. CR-F-92-5164, Petitioner filed a "Motion Seeking a Court 'Order' for the Thorough Testing of the Government's Trial Exhibits 3-A & 5-A, (Which the Government Finally Located in the Possession of the California Department of Justice - Bureau of Narcotics), Petitioner Can and Will Support His Actual Innocence Claims with the Chemical Tests Results of 3-

22

A & 5-A".  On March 13, 2006, petitioner filed a "Motion for

Court Order Release of Samples of Trial Exhibits 3-A and 5-A from

the California Bureau of Narcotic Enforcement, (BNE), to Attorney

Cheryl Strum for the Purpose of Having Them Analyzed to Determine

Their Exact Chemical Make-Up to Establish Movants Actual

Innocence."  By these motions, petitioner sought "a Court ORDER

for the thorough testing of the Government's Trial Exhibits 3-A

and 5-A [¶ which] testing is to determine the exact chemical

make-up, the purity, identifying the adultants [sic] and the

individual weights of 3-A and 5-A" to show "their exact chemical

make-up to prove his Actual Innocence Claims."  Government Trial

Exhibit 3-A is a 55 pound tin of ephedrine seized during a search

at 3904 Fir Street, Fresno, CA on May 20, 1992.  Government Trial

Exhibit 5-A is a box of suspected ephedrine seized during a

search of 48038 93rd Street, Lancaster, CA on May 20, 1992.

On May 1, 2006, petitioner filed a "Motion for Court Order

to the California State Attorney General, Bill Lockyer, to

Produce Copies of the Material Safety Data Sheet, Packaging &

Product Information Telling the Chemical Make-Up & Content of the

55 Lb Tins of Ephedrine Provided By & Stored in the Evidence

Vault of the State Bureau or Narcotic Enforcement & Used in this

Case as 'Trial Exhibit 3-A'".  In the May 1, 2006 motion,

petitioner asserted:

> The requested information, such as the
> 'Material Safety Data Sheet' on stored
> hazardous chemicals that may be toxic,
> dangerous or pose a public safety hazard are
> required by state and federal law (See § 302

23

1                of the Emergency Planning & Community Right
                  to Know Act of 1986 [42 USCS § 11002]).

2                State Attorney General Bill Lockyer has
                  refused Petitioner's F.O.I.A Requests for the

3                documented information such as the Material
                  Safety Data Sheet in violation of state,

4                federal, E.P.A. & OSHA laws.

5 Petitioner further contended that the Material Safety Data Sheet

6 "shows the exact chemical make-up of Trial Exhibit 3-A" and that

7 the Material Safety Data Sheet "in lieu of actually being able to

8 have Trial Exhibit 3-A analyzed, would provide Petitioner with

9 the long sought after exculpatory evidence to prove his Actual

10 Innocence Claim that was presented in his 2255 Motion."

11 Petitioner asserted that "[o]nce the true chemical make-up of

12 Trial Exhibit 3-A can be established Petitioner will have the

13 Newly Discovered (& with held) Evidence needed to re-open the

14 2255 Motion Proceedings and to establish his valid Actual

15 Innocence Claim."

16     By Order filed on May 9, 2006 (Doc. 863), all of these

17 motions were denied by Judge Coyle on the ground that the Court

18 did not have the authority to grant the requested relief.   Judge

19 Coyle further ruled:

20                Furthermore, even if the court has the
                authority to issue the requested orders,

21                petitioner has made no showing that testing
                of Government Exhibits 3-A or 5-A will

22                establish his "actual innocence" of the
                crimes of which he was convicted such that

23                the instant motions should be granted.  As
                noted supra, petitioner's request for

24                retesting of Government Exhibits 3-A and 5-A
                in connection with the Section 2255 motion

25                was denied.   As noted in the Order denying
                petitioner's Section 2255 motion, evidence

26                was presented by petitioner at his jury trial

that petitioner's Formula J made a copycat drug that altered ephedrine to look like methamphetamine, that the suspected methamphetamine seized at petitioner's Oakley residence was not methamphetamine but ephedrine processed to look like methamphetamine, that a synthesis using petitioner's Formula J process was performed by petitioner's expert witness, who testified that the resulting process was simply ephedrine in another form and who testified that petitioner's Formula J would not produce methamphetamine.  Notwithstanding this evidence and the other evidence described in the Order denying petitioner's Section 2255 motion, the jury did not believe petitioner or petitioner's expert witness.

As explained in <u>Ivy v. Pontesso</u>, 328 F.3d 1057, 1059-1060 (9th Cir. 2003):

'In general, § 2255 provides the exclusive procedural mechanism by which a federal prisoner may test the legality of his detention.' ... However, a prisoner may proceed under § 2241 if he can show that 'the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention.' ... This Court has not fully explained when § 2255's remedy is 'inadequate or ineffective.' ... However, we have stated that this exception is narrow ... and that § 2255's remedy is not 'inadequate or ineffective' merely because § 2255's gatekeeping provisions prevent the petitioner from filing a second or successive petition ....

...

We have not had occasion to decide when a claim of actual innocence entitles a petitioner who is procedurally barred from filing a second or successive motion under § 2255 to seek relief under § 2241. Our sister circuits, however, have

25

held that § 2255 provides an 'inadequate or ineffective' remedy (and thus the petitioner may proceed  under § 2241) when the petitioner claims to be: (1) factually innocent of the crime for which he has been convicted; and (2) has never had an 'unobstructed procedural shot' at presenting this claim ... In other words, it is not enough that the petitioner is presently barred from raising his claim of innocence by motion under § 2255.  He must never have had the opportunity to raise it by motion.

As noted, petitioner's request that this court order the testing of the chemical exhibits has been made by petitioner repeatedly, including a number of times prior to trial and after trial.  All such requests were denied.  Petitioner did not appeal the denial of his pre-trial requests to compel the testing of Government chemical exhibits. As noted, petitioner again moved for re-testing of the Government's chemical exhibits in connection with his Section 2255 petition, which motion was denied.  Therefore, petitioner has not made a showing of "actual innocence" that would allow him to file a motion under Rule 60(b), Federal Rules of Civil Procedure, to vacate the judgment denying the Section 2255 motion or would allow petitioner to file a motion for relief pursuant to 28 U.S.C. § 2241 pursuant to <u>Ivy v. Pontesso</u>.

Petitioner filed a motion for reconsideration, which was denied.

Petitioner appealed both rulings to the Ninth Circuit.  By

Memorandum filed on July 13, 2007, the Ninth Circuit affirmed

Judge Coyle's rulings:

The district court properly concluded that Farrugia's motions are unrelated to any actions currently pending.  Accordingly, the district court's orders denying the motions and denying the motion for reconsideration are affirmed.

26

1    Rule 60(b)(6), Federal Rules of Civil Procedure, provides in

2  pertinent part:

3            On motion and upon such terms as are just,
             the court may relieve a party ... from a
4            final judgment, order, or proceeding for the
             following reasons ... (6) any other reason
5            justifying relief from the judgment.

6      In *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the Supreme

7  Court discussed the interaction between Rule 60(b), Federal Rules

8  of Civil Procedure, and the AEDPA.  After noting that the AEDPA

9  and its decisions make clear that a "claim" "is an asserted

10  federal basis for relief from a ... judgment of conviction", *id.*

11  at 530, the Supreme Court stated:

12            In some instances, a Rule 60(b) motion will
             contain one or more 'claims.'  For example,
13            it might straightforwardly assert that owing
             to 'excusable neglect,' Fed. Rule Civ. Proc.
14            60(b)(1), the movant's habeas petition had
             omitted a claim of constitutional error, and
15            seek leave to present that claim ...
             Similarly, a motion might seek leave to
16            present 'newly discovered evidence,' Fed.
             Rule Civ. Proc. 60(b)(2), in support of a
17            claim previously denied ... Or a motion might
             contend that a subsequent change in
18            substantive law is a 'reason justifying
             relief,' Fed. Rule Civ. Proc. 60(b)(6), from
19            the previous denial of a claim ... Virtually
             every Court of Appeals to consider the
20            question has held that such a pleading,
             although labeled a Rule 60(b) motion, is in
21            substance a successive habeas petition and
             should be treated accordingly ....

22            We think those holdings are correct.  A
23            habeas petitioner's filing that seeks
             vindication of such a claim is, if not in
24            substance a 'habeas corpus application,' at
             least similar enough that failing to subject
25            it to the same requirements would be
             'inconsistent with' the statute.  28 U.S.C. §
26            2254 Rule 11.  Using Rule 60(b) to present

27

new claims for relief from a state court's judgment of conviction - even claims couched in the language of a true Rule 60(b) motion - circumvents AEDPA's requirement that a new claim be dismissed unless it relies on either a new rule of constitutional law or newly discovered facts. § 2244(b)(2).  The same is true of a Rule 60(b)(2) motion presenting new evidence in support of a claim already litigated: even assuming that reliance on a new factual predicate causes that motion to escape § 2244(b)(1)'s prohibition of claims 'presented in a prior application,' § 2244(b)(2)(B) requires a more convincing factual showing than does Rule 60(b). Likewise, a Rule 60(b) motion based on a purported change in the substantive law governing the claim could be used to circumvent § 2244(b)(2)(A)'s dictate that the only new law on which a successive petition may rely is 'a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.'  In addition to the substantive conflict with AEDPA standards, in each of these three examples use of Rule 60(b) would impermissibly circumvent the requirement that a successive habeas petition be precertified by the court of appeals as falling within an exception to the successive-petition bar. § 2244(b)(3).

In most cases, determining whether a Rule 60(b) motion advances one or more 'claims' will be relatively simple.  A motion that seeks to add a new ground for relief ... will of course qualify.  A motion can also be said to bring a 'claim' if it attacks the federal court's previous resolution of a claim *on the merits*, since alleging that the court erred by denying habeas relief on the merits is effectively indistinguishable from alleging that the movant is, under the substantive provisions of the statutes, entitled to habeas relief.

*Id.* at 531-532.   However, the Supreme Court ruled:

That is not the case ... when a Rule 60(b) motion attacks, not the substance of the federal court's resolution of a claim on the

28

1    merits, but some defect in the integrity of
     the federal habeas proceedings.
2

3    *Id.* at 532.   The Supreme Court noted:

4              Fraud on the federal habeas court is one
               example of such a defect.  See generally
5              *Rodriguez v. Mitchell*, 252 F.3d 191, 199 (CA2
               2001)(a witness's allegedly fraudulent basis
6              for refusing to appear at a federal habeas
               hearing 'relate[d] to the integrity of the
7              federal habeas proceeding, not to the
               integrity of the state criminal trial').  We
8              note than an attack based on the movant's own
               conduct, or his habeas counsel's omissions,
9              see, *e.g., supra*, at 530-531, ordinarily does
               not go to the integrity of the proceedings,
10             but in effect asks for a second chance to
               have the merits determined favorably.

11        Petitioner is seeking pursuant to Rule 60(b)(6) to re-open

12   the previously denied Section 2255 motion in order to compel

13   retesting of evidence submitted during his criminal trial, which

14   re-testing, Petitioner asserts, will demonstrate his "actual

15   innocence."   As noted, Petitioner made such a request in

16   connection with the initial Section 2255 proceedings, which

17   request was denied.   Further, and more critically, Petitioner's

18   claim that he was denied the effective assistance of counsel at

19   trial because of counsel's failure to conduct forensic testing of

20   the substances was rejected on the merits after extensive

21   analysis which included comprehensive review of the trial

22   evidence on the subject.   Pursuant to *Gonzalez v. Crosby*,

23   Petitioner cannot use the vehicle of Rule 60(b)(6) to circumvent

24   the second or successive Section 2255 petition requirements.

25        As Judge Coyle correctly ruled, Petitioner cannot

26   demonstrate "actual innocence" as required by *Ivy v. Pontesso*,

                                    29

*supra,* **328 F.3d at 1059-1060, thereby allowing the conversion of this motion to re-open the Section 2255 proceedings to a motion for relief pursuant to 28 U.S.C. § 2241.  Petitioner cannot demonstrate that he never had an unobstructed procedural shot at presenting his claim.**

    **C.   Petitioner's Motion to Expand the Record.**

    **Petitioner moves to "expand the record with the following attached statements & sworn affidavits in support of his actual innocence."  This motion sets forth only the criminal case number and does not reference the Section 2255 motion.**

    **Attached to Petitioner's motion is a Declaration executed by Anthony Simone on June 26, 2003 wherein Mr. Simone avers that he has never met Petitioner; that the first time he ever heard Petitioner's name was after Simone's arrest when Petitioner was added as defendant in the indictment; and that the first time Simone ever spoke with Petitioner was over the telephone after Simone's release from custody when Petitioner asked Simone to verify facts concerning his case.  Simone further avers:**

        **(3.)  At the time of Mr. Farrugia's trial I had already pled guilty and was serving my sentence, thus available to testify.**

        **(4.) Prior to Mr. Farrugia's trial I had been interviewed by Kapperman's Attorney, Mr. Harralson, and had agreed to testify for both Kapperman and Farrugia's defense.  Mr. Nix, Farrugia's attorney never spoke with me.**

        **(5.) Ronald Banks and myself were subpoenaed by Mr. Harralson and moved back to Fresno to testify but were never called to the stand.**

        **(6.) If called, I would have testified that**

Mr. Farrugia was not involved in the
conspiracy to purchase the ephedrine or to
manufacture the methamphetamine.  Only
Richard Morgan, Ronald Banks and myself were
involved and it was Morgan himself that would
act as the drug manufacturer.

(7.)  After our arrests it came to light that
Richard Morgan was shifting the blame of
being the actual manufacturer to Farrugia to
gain a lighter sentence for himself.  Our
testimony would have prevented this.

(8.)  Richard Morgan, Ronald Banks and myself
had been friends for many years and we all
confided in each other up to and until the
time of our arrests.  If anyone else had been
involved in our scheme we would have all been
aware.  Mr. Farrugia's name was never
mentioned and there was never a reason to
involve anyone else.

(9.)  If called to testify I would have
supported Mr. Farrugia's actual innocence
claim and provided information to impeach
Richard Morgan.

(10.)  I make this statement of my own free
will without fear of threat, coercion or
promise of personal gain.

Also attached to Petitioner's motion is an undated letter

from Simone to Cheryl Strum, Petitioner's attorney in the Section

2255 proceedings, regarding Petitioner, and stating:

I have enclosed the following Notarized
Affidavit regarding [Petitioner].

I would like to make the statement that Mr.
Morgan stated to me regarding this matter
that Mr. Morgan state to me he is the cook in
this conspiracy to manufacture meth.

This letter has an handwritten notation: "Doc # 821 June 27,

2000".  Doc. 821 is a motion by Petitioner filed on June 26, 2000

to supplement his traverse in support of the Section 2255 motion,

31

1   which motion was granted by Order filed on June 26, 2000 (Doc.

2   822).

3        Petitioner's motion attaches a Declaration dated July 24,

4   2006 and executed by Linda Langer.  Ms. Langer avers:

5            I was married to Donald Kappermans [sic] son,
             Mike Dowling from 1985 to 1996.  Mike is
6            Annette Dowlings [sic] son and brother to
             Kelly and Kevin Dowling.  Donald Kapperman is
7            the grandfather of my daughter.

8            Around March and/or April of 1992 and right
             around when the house in Lancaster was
9            raided, I personally witness [sic] and was at
             the house when Annette, Kelly and Mike use
10           the telephone at the Lancaster redsident
             [sic].  They would order ephedrine pill [sic]
11           and each time Annette and Kelly would use
             there [sic] credit cards.  I saw Mike use his
12           credit card sometimes two.  In March and/or
             April of 1992 and exactly one day after the
13           raid at Lancaster I was at the Lancaster
             resident [sic] when Annette and Kelly Dowling
14           receive package from the mail at the
             Lancaster resident's [sic].  I remember
15           exactly what the ephedrine pills look like
             and what the bottles look like.  The pills
16           were white and look like cross tops like the
             kind you use [sic] to be able to order from
17           High Times Magazine.  The ephedrine pill
             bottle was small white plastics [sic] with
18           red labels on them.  In each bottle there
             were 500 ephedrine pills and each pill was
19           25mg [sic].  I was present and witness [sic]
             Mike, Annette and Kelly Dowling crush the
20           ephedrine pills into powder than [sic] they
             would put this powder into a box.  I also
21           sometimes help crush the ephedrine pills into
             powder if Mike told me to.  This is the same
22           box that they found at Lancaster resident
             [sic] when it was raided.  Since I was there
23           and precipitated [sic] in crushing the
             ephedrine pills I know for a fact that Donald
24           and Tom never precipitated [sic] in crushing
             ephedrine pills.  The day before the raid
25           when Mike, Annette, Kelly and Kevin were
             crushing the pills I ask how much do you
26           think there is of powder there?  Mike said

                              32

that so far he and his mother and two
brothers have crush up about [sic] 20 pounds.
I know for a fact that none of the ephedrine
came from Fresno or Richard Morgan.  We had
are [sic] own ephedrine in Lancaster.  Tom
Farrugia and Donald Kapperman never order
anything for the Dowlings of ephedrine pills
and the only people that had credit cards
were Annett [sic], Kelly and Mike Dowling,
the Dowlings were the ones who order the
ephedrine pills and crush up the pills.  I
always went with Mike when he went to the
Lancaster residence that's why I know Donald
and Tom was never involve [sic] with the
ordering and purchase of any ephedrine pills
because I was present.  I a [sic] willing to
testify under oath about that and any
statement regarding this statement.  I will
also take the stand and testify that I
witness [sic] and was present and know that
Donald and Tom were wrongfully accused and
did not commit the crime that they were
accused of.  The Dowlings are the ones who
should have been charge [sic] with something.
Donald Kapperman and Tom Farrugia are not
guilty they are innocent.  Michelle, Donald's
grandchild is willing to testify that her dad
told her that Annette and Kelly, Kevin and
him set her grandfather up because they were
scare [sic] they were going to jail because
they were the ones who did everything so they
set up Tom and Donald so they wouldn't get
caught and go to jail.  I swear under penalty
of perjury the above facts are true.

Attached to Petitioner's motion is a Declaration dated June

10, 2004 executed by Ronald Banks.  Banks avers that the first

time he met Petitioner was in 1993, when Petitioner called him

and asked Banks to testify on Petitioner's behalf at his trial.

Banks avers:

4.)  I willingly agreed to testify at his
upcoming trial.  I had already pled guilty
and therefore had nothing to hide or reason
not to testify for him.

5.)  After we were sentenced, Anthony Simone

33

and I were interviewed by Mr. Daniel
Harralson, Kapperman's Defense Attorney, who
stated that I was being subpoenaed at Mr.
Farrugia's request to testify on his behalf.
I never spoke with Mr. Barry Nix, Farrugia's
Attorney.

6.) Anthony Simone and I went back to Fresno
to testify on Mr. Farrugia's behalf at their
joint trial in June of 1994 but were never
called.

7.) If called to testify I would have stated
that Richard Morgan, Anthony Simone and I had
known eachother [sic] for many years.  That
up to the time of our arrests we were friends
and confided in each other completely.  At no
time was the name of Thomas Farrugia brought
up nor was there to be any one else involved
with Richard Morgan in making the drugs.

8.) If called to testify I could have said
that I had been involved since 1991 when we
first attempted to obtain ephedrine thus I
knew the details and everyone who was
involved.  That Mr. Farrugia played no part
in our purchase of the ephedrine and was
innocent of being part of the conspiracy.

9.) After our arrests it became apparent
that Richard Morgan was trying to make a deal
and shift the blame of being the actual
manufacturer to others to get a lighter
sentence.

10.) If I had testified I would have
discredited Richard Morgan's statements and
his character.  Also, that he was a very
convincing lier [sic].  I could have also
explained Morgan's motivation for his
misleading statements.

11.) It is apparent from Mr. Farrugia's
being found guilty of being involved in our
drug conspiracy, that his defense counsel
made a very serious tactical error by not
allowing Anthony Simone or myself to testify
on his behalf.

12.) Even after Mr. Farrugia's name was
included in the indictment, Richard Morgan

34

1　　　commented to me that he had no idea who
　　　　Farrugia was or why he was being charged in
2　　　the same conspiracy with us.

3　　　13.)  Our testimony would have also made it
　　　　clear that because we had never met or even
4　　　heard of Thomas Farrugia, we would never have
　　　　agreed for him, a total stranger, to have
5　　　been involved in any way.

6　　　14.)  If called to testify I would have
　　　　stated the above facts under oath and without
7　　　any fear of punishment or promiss [sic] of
　　　　reward because I was already sentenced and
8　　　serving my prison term.  I had nothing to
　　　　lose or gain by testifying honestly at Thomas
9　　　Farrugia's trial.

10　　　　Also attached to Petitioner's motion is a copy of two pages

11　of a three-page Report of Investigation by DEA Special Agent Ann

12　Kromberg dated November 18, 1992 based on an interview of a James

13　L. Bennett.  Because the copy attached to Petitioner's motion is

14　Bates-stamped "000453", it appears to be a document provided in

15　discovery, although it is not clear if it was provided in

16　discovery in the criminal case against Petitioner.  The Report of

17　Investigation states that Bennett and John J. Streit were

18　arrested after delivering one kilogram each of cocaine and

19　methamphetamine to an undercover agent on November 13, 1992.  The

20　Report of Investigation further states in pertinent part:

21　　　　3.  BNE S/A Rische asked BENNETT where he got
　　　　the methamphetamine.  BENNETT stated that the
22　　　methamphetamine came from an [sic] 'Mexican
　　　　named Steve, from San Jose.'  BENNETT stated
23　　　that the Mexican guy dropped the stuff in the
　　　　bushes in front of his house.  BNE S/A Rische
24　　　asked BENNETT to repeat his answer again.
　　　　BENNETT stated that a well dressed Mexican
25　　　guy named John from up north put the
　　　　methamphetamine in the bushes in front of his
26　　　house.  BNE S/A Rische asked how does he

contact 'John.'  BENNETT stated he does not
have a telephone number or any way of
contacting John.  BENNETT stated John calls
him and comes by.  BNE S/A Rische asked how
he met John.  BENNETT stated he was
introduced to John by Ted.  (Johnny Ted
NASH).

...

6.  BENNETT stated he wanted to cooperate
however he was concerned for his safety.  BNE
S/A Rische asked BENNETT if he knew where Ted
NASH was.  BENNETT stated he knew NASH was
going to leave, but did not want to know
where he went.  BENNETT stated he heard from
Glen (ATKINSON) that Ted NASH was leaving.
BENNETT stated that he heard NASH went to
Mexico and that he (NASH) was to call him.
BENNETT stated that NASH was going to 'cook
and run coke and I would handle the
distribution end.'  BENNETT stated that NASH
has not tried to get a hold of him yet.
BENNETT was asked by BNE S/A Rische how did
NASH remove the device from his ankle.
BENNETT stated that NASH used a hair dryer to
heat and the [sic] stretch the device.
BENNETT was asked how did NASH leave the
area.  BENNETT stated that NASH had a flight
arranged at one of the airports and left.
BENNETT stated he knew nothing more about the
flight.

7.  BENNETT was asked if he has had any
contact with NASH's family.  BENNETT stated
that Carolyn (GLICK-NASH) came by his house
the other day and that Oleta (NASH) called a
couple of days ago.  BENNETT stated that
neither of them said anything about NASH.
BENNETT was asked if he had heard from Doug
LOW.  BENNETT stated that LOW called a couple
of days ago from prison.  BNE S/A Rische
asked BENNETT where is Rick ELROD.  BENNETT
stated he is up in Redding (California).

8.  BNE S/A Rische asked BENNETT if he knew
where the 55 pounds of ephedrine when.
BENNETT stated he talked to NASH the day
before and after the delivery and that he
thinks that Glen (ATKINSON) took the
ephedrine.

9.   BNE S/A Rische asked BENNETT if he knew Anthony SIMONE.  BENNETT stated he knew SIMONE and that NASH asked him to call SIMONE.  BENNETT further stated that NASH wanted to know 'if the Mexicans he was negotiating the purchase of chemicals with worked for Anthony.'  BENNETT stated that SIMONE said that NASH should be careful of anyone that would mention his name.  BENNETT stated that SIMONE confirmed that the Mexicans had worked for him.  BENNETT stated that he called NASH and told him what SIMONE said.

10.   BENNETT stated that the day before SIMONE was arrested (ephedrine reverse May 1992) he was at Cookie's Upholstery Shop (located rear of K-Mart Blackstone and Barstow, Fresno), he (BENNETT) stopped by to see the owner and ran into SIMONE.  BENNETT stated that SIMONE told him he would be coming into a large amount of ephedrine.  BENNETT stated SIMONE said he could handle all he could get.  BENNETT stated he told SIMONE to be careful.  BENNETT said SIMONE replied I'll either have a lot of ephedrine or be in jail.

Attached to Petitioner's motion is a "supplemental" declaration dated August 19, 2006 executed by Donald Kapperman.  Kapperman avers:

I am providing this Affidavit to clear-up [sic] some erroneous information Mr. Farrugia has asked me to correct.  I ask that this statement be accepted as my sworn written testimony.

1.   The claim that Mr. Farrugia was a resident at the Dowling's Lancaster property is misleading and untrue.  Farrugia lived and worked in Oakley, Ca., which was hundreds of miles away.  He visited Lancaster often but Farrugia never stayed over more than a few days at a time.

2.   Mr. Farrugia did not possess a key to the shed at Lancaster.  The only key to the shed's door was always stashed in the fork of

the tree by the door for anyone to use.

3.  Most of the items found inside the Lancaster shed did not belong to Farrugia. Annette Dowling and her family all had items in the shed.  The glassware came from Annette's Sister's [sic] husban [sic].  He and his Son [sic] are chemist [sic] and they recently cleared those items out of their own storage locker in Palmdale and had them moved to the Lancaster shed to store.

4.  The information and testimoney [sic] of Ms. Dowling against Farrugia was coerced and tainted for fear of her and her son being re-charged.  Her and Kevin were arrested with me but later released on condission [sic] she cooperated against Farrugia, which she did. This resulted in his being blamed for the box of crushed-up ephedrine pills found in the shed which belonged to her and two of her sons.

5.  I myself did not wish to allow my Expert, Chemist Dr. Wilson, to testify at either trial so as to keep from disclosing his test results of the items found inside the Lancaster shed.  There was a conflict of interests in that Dr. Wilson's analysis of the box of 'suspected ephedrine' would have been more damaging to Annette and her sons that it would have been helpful to me.

6.  I did not sign the 'Release of Information' releasing Dr. Wilson's test results until 1997 because of the Five Year Statute of Limitations to protect Annette and her Sons from being prosecuted.

7.  Mr. Farrugia has never been my cell-mate in prison.   Who ever said that has him confused with somebody else.

8.  Annette always knew Mr. Farrugia's name and who he was.  Farrugia and Annette Dowling had been corresponding for some time before he had been released from Lompoc.

9.  Since my arrest Farrugia and I have been housed separately so our communication has been restricted.  It wasn't until I was

38

> recently moved to USP Terre Haute that we
> could talk freely so I could inlighten [sic]
> him as to the true source and ownership of
> the 'so-called' ephedrine found in the shed
> at Lancaster.

Again, Petitioner cannot, based on these declarations, obtain relief pursuant to Section 2255 or Section 2241.  With regard to Section 2255, Petitioner's claim that he was not part of the alleged conspiracy was heard in connection with Petitioner's Section 2255 motion and resolved against Petitioner on the merits.  In fact, the substance of these declarations was presented both at trial and in the Section 2255 proceedings.[1] Substantial revisionist history, contrary to Petitioner's testimony at trial and other evidence presented at trial, more than fifteen years following the offense events, does not show actual innocence.  Petitioner cannot rely on the evidence submitted in his motion to expand the record to convert the motion to a Section 2241 motion because Petitioner cannot establish "actual innocence" as required by *Ivy v. Pontesso*, *supra,* 328 F.3d at 1059-1060.  Petitioner cannot demonstrate that he never had an unobstructed procedural shot at presenting his claim.

## CONCLUSION

For the reasons set forth above:

---

[1] Some of these averments contradict Petitioner's testimony at trial.  For instance, Petitioner testified that he met first Kapperman while they imprisoned together at Lompoc.  Petitioner testified that he had the key to the padlock for the shed in Lancaster, although sometimes he kept it in a tree outside the shed.

1      1.   Petitioner's "Motion to Expand the Record With Sworn

2   Affidavits, Statements and Documents That Suport [sic] Movant's

3   Actual Innocence" is DENIED;

4      2.   Petitioners  "Motion to Re-open Section 2255 Proceedings

5   Pursuant to Fed. R. Civ. P. 60(b)(6)" is DENIED.

6      IT IS SO ORDERED.

7   Dated:   November 13, 2007            /s/ Oliver W. Wanger
                                     UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26